# United States Court of Appeals
## For the Eighth Circuit

_____

No. 12-3958

_____

In re: Genetically Modified Rice Litigation,

------------------------------

The Phipps Group,

*Appellant*,

v.

Don M. Downing and Adam J. Levitt, Plaintiffs' Co-Lead Counsel and on behalf of all Common Benefit Attorneys,

*Appellee*.

_____

No. 12-4045

_____

In re: Genetically Modified Rice Litigation,

------------------------------

Don M. Downing and Adam J. Levitt, Plaintiffs' Co-Lead Counsel and on behalf of all Common Benefit Attorneys,

*Appellant*,

v.

The Phipps Group,

*Appellee*.

Appeal from United States District Court
for the Eastern District of Missouri - St. Louis

---

Submitted: September 25, 2013
Filed: August 22, 2014

---

Before LOKEN, COLLOTON, and BENTON, Circuit Judges.

---

COLLOTON, Circuit Judge.

The district court[1] appointed Don Downing and Adam Levitt, among others, as leadership counsel to coordinate the pretrial activities of plaintiffs in a multidistrict litigation ("MDL"). The Phipps Group ("Phipps") represented some plaintiffs, but was not a member of the attorney leadership group. In 2010, the district court established a common benefit trust fund ("the Fund") to compensate the leadership group for their common benefit work. The plaintiffs settled the litigation. In 2012, the district court awarded common benefit fees from the Fund to leadership counsel, and denied Phipps's request for a common benefit award. Phipps and Phipps's clients raise various challenges to the establishment of the fund and the award of fees, and Downing and Levitt cross-appeal. We affirm.

---

[1]The Honorable Catherine D. Perry, United States District Judge for the Eastern District of Missouri.

I.

In state and federal court, several thousand rice farmers, to whom we will refer as "producers," and others involved in the rice business who are "non-producers," sued Bayer CropScience after Bayer's genetically modified rice, which had not been approved for human consumption, tainted the U.S. rice supply. The Judicial Panel on Multidistrict Litigation established a multidistrict litigation under 18 U.S.C. § 1407, transferring several hundred federal court cases to the United States District Court for the Eastern District of Missouri to handle the pretrial phases of those federal suits.

On April 18, 2007, the district court appointed a leadership group of plaintiffs' attorneys—including Don Downing and Adam Levitt as Lead Counsel—to orchestrate pretrial litigation for all MDL plaintiffs with claims against Bayer. To foster the efficiency-related goals of the MDL mechanism, the court not only mandated cooperation among federal rice plaintiffs' counsel, but also "directed [all counsel] to take all appropriate steps to provide as much coordination as possible between [the federal MDL] actions and any related matters pending in state court." Lead Counsel spearheaded litigation-wide collaboration. These attorneys coordinated pretrial discovery, prepared for and conducted numerous depositions, appeared before the district court at hearings and status conferences, selected and prepared experts, and performed and assisted with bellwether trials. Lead Counsel shared their work with all rice plaintiffs, in both federal and state court. Phipps was not a member of the leadership group.

During pretrial preparations, and shortly before the MDL litigation's first bellwether trial, Lead Counsel filed a motion to create a common benefit trust fund. Lead Counsel argued that a common benefit trust fund could and should be used to pay certain fees and expenses of Lead Counsel and other attorneys who performed work benefiting all rice plaintiffs. The district court agreed and—in a "Common

Benefit Fund Order" filed on February 24, 2010—mandated the establishment of the Fund. The district court found that *all* rice plaintiffs, including those in state court, had benefited substantially from the work of Lead Counsel. But the court "reluctantly" found that it did not have jurisdiction to order holdbacks from state-court rice recoveries. The court ordered that money from all awards or settlements in MDL cases be set aside to finance the Fund, but merely "encourage[d] defendants to seek the state court plaintiffs' agreement as part of any settlements or to seek orders . . . from the appropriate state courts" that state plaintiffs participate in the Fund.

In its 2010 Order, the district court also determined, after reducing slightly the contribution required from European non-producers, that the holdbacks requested by Lead Counsel were reasonable. The order setting up the Fund, however, "[wa]s not an award of attorneys' fees," so the district court did not yet need "to determine whether the leadership group ha[d] earned the entirety of the proposed contribution." Rather, the 2010 Order provided that "[n]o disbursement shall be made from the [Fund] . . . except upon further order of [the] court after a hearing upon notice to all parties." The 2010 Order permitted "any plaintiffs' counsel (whether part of the leadership group or not)" to "petition for distribution of funds if that counsel believes he or she has provided a common benefit to plaintiffs other than his or her own clients."

The district court found that Phipps received several benefits from the work of Lead Counsel. For example, the court stated that Phipps used "documents and other discovery from Bayer obtained by the leadership group." Likewise, the court explained, "[a] member of the Phipps firm attended all depositions conducted by the leadership group and asked questions at the end," and "[a] representative of the Phipps firm was in daily attendance at the second bellwether trial." An Arkansas state court, in one of Phipps's state-court rice suits, similarly found that Phipps benefited from the work performed by the leadership group in the federal MDL.

The litigation progressed further, and the parties eventually agreed to settle. An MDL Settlement Agreement was entered into "by and among" Bayer, Negotiating Claimants' Counsel, and "each Enrolled Claimant and Eligible Claimant who is bound by this Agreement according to its terms." Likewise, "by submitting an Enrollment and Claims Package, Enrolling Counsel and each Eligible Claimant . . . agree[d] to be bound by all of the terms and conditions of [the] Agreement." Lead Counsel are among Negotiating Claimants' Counsel, but Phipps is not. Phipps submitted claims on behalf of claimants who enrolled in the settlement, so Phipps is an Enrolling Counsel who agreed to be bound by the Agreement's terms. The MDL Settlement Agreement provided that "[a]ll payments to Enrolled Claimants . . . under [the] Settlement Agreement shall be made as if Judge Perry's February 24, 2010 Common Benefit Fund Order applied to those claims," including that 8 percent of all payments to the Enrolled Claimants be paid to the Fund for attorneys' fees and 3 percent of all payments be directed to the Fund for costs and expenses incurred by attorneys providing a common benefit.

After settlement was reached, Lead Counsel and other common benefit attorneys sought a distribution of monies from the Fund. On September 4, 2012, the district court appointed retired federal judge Stephen N. Limbaugh, Sr., as Special Master "to review and issue a recommendation relating to the protocols, processes and allocation for distribution of Common Benefit Fees and Expenses." The Special Master considered Lead Counsel's motion for allocation of Fund monies and objections to that motion made by other plaintiffs' attorneys. The Special Master also reviewed other attorneys' requests for common benefit work disbursements.

On November 2, 2012, after meeting with Lead Counsel, as well as Phipps and two other members of Phipps's legal team, the Special Master made his report and recommendation. The Special Master explained that he had "carefully reviewed the exhibits attached to Lead Counsel's motion" for allocation. Although the Special Master initially considered "review[ing] the time sheets and records underlying each

counsel's fee request," he felt it was unnecessary "[a]fter examining all declarations of counsel and particularly those of Lead counsel." Instead, the Special Master examined the processes used by Lead Counsel in their review of attorneys' requests for common benefit fees. The Special Master found that Lead Counsel's review, among other benefits, had "identified and removed duplicative or excess billing" and "removed entries for individual client work."

The Special Master determined that the fees requested were substantively reasonable. Under the global producer settlement, Bayer was to pay $750 million to producer plaintiffs. That global settlement amount includes both the MDL Settlement Agreement, covering claimants in the MDL and others agreeing to its terms, and the so-called "GMB settlement," which was executed by Phipps and other attorneys and covers claimants outside of the MDL. Lead Counsel requested $51,584,012.54 in fees and $5,468,450.26 in expenses. The Special Master found that the monies requested were "well within the 8% established by the court" and recommended that the district court find the amount to be reasonable.

In adjudging Lead Counsel's request reasonable, the Special Master also discussed the twelve factors for determining attorneys' fees set forth in *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714, 717-19 (5th Cir. 1974), and adopted by this Court in *Hardman v. Board of Education of Dollarway, Arkansas School District*, 714 F.2d 823, 825 (8th Cir. 1983). In particular, the Special Master noted the length of the MDL litigation, the scope of discovery required, the numerosity of plaintiffs and lawyers, and the challenging legal issues underlying the case.

The Special Master acknowledged that some of the hourly rates used by Lead Counsel to calculate the fee request were "high," but found that they were not unreasonable or outside the normal range when considered in light of "rates charged by experienced counsel in the areas where each lawyer practices." The Special

Master noted that Phipps was alone in his objection to the reasonableness of the fees requested.

Again over Phipps's objection, the Special Master approved Lead Counsel's request for a fee multiplier award for six law firms who demonstrated "extraordinary contribution and effort."  The Special Master concluded that the six firms in question "spearheaded plaintiffs' prosecution of the MDL cases and provided the leadership required to achieve an excellent result," and thus were "entitled to receive a fee multiplier."  The Special Master found that the fee multiplier requested was "below the average" awarded in similar cases.  As such, the Special Master recommended that Lead Counsel's request for a fee multiplier be granted.  According to the Special Master, the roughly $57 million in fees and expenses requested should be paid to Lead Counsel and the other common benefit attorneys first; $1,355,594.74 should next be paid to Hare, Wynn, Newell, and Newton, LLP[2]; and then "when the Common Benefit Fund accumulates a sum not exceeding $72 million, the balance remaining after the [initial] payouts . . . be . . . paid proportionately to the six firms" as a fee enhancement.

The Special Master rejected Phipps's claim that discovery was needed for full review of the common benefit attorneys' time sheets and to allow Phipps and others to respond more fully to Lead Counsel's fee allocation request.  The Special Master determined that Phipps had not complied with the requisite discovery rules in making its request.  The Special Master found in any event that Lead Counsel had provided sufficient documentation for review of the allocation requested, particularly since a

_____

[2]In an agreement with Lead Counsel, Hare Wynn consented to having its state-court cases participate in the MDL Fund.  Pursuant to the agreement, Hare Wynn was required to contribute only 7 percent, rather than 8 percent, of its clients' recoveries to the Fund.  Hare Wynn already had paid 8 percent, so was entitled under its agreement with Lead Counsel to a refund of $1,355,594.74.

reviewing court "may rely on summaries of attorneys and need not review actual billing records."

The Special Master also considered and denied Phipps's request for a distribution of Fund monies. Phipps alleged that its work representing almost five thousand clients had "forced Bayer to work on state and MDL cases and helped forge the settlement." Phipps highlighted that two of its cases resulted in highly favorable trial victories, and argued that its successes enhanced Lead Counsel's leverage in settlement negotiations. Phipps claimed that this and much of its other work accrued to the benefit of all rice plaintiffs, and thus Phipps sought $13,271,247.50 in common benefit fees from the Fund. The Special Master rejected Phipps's assertions, instead finding that Phipps "worked independently, developed [its] own strategy and prepared [its] cases for trial separate and apart from common benefit attorneys." The Special Master likewise determined that Phipps's "work ha[d] been performed in the client's interest and not for the common good," in part because "[t]here was never any attempt to co-ordinate Phipps activities with those of Lead Counsel." Thus, the Special Master recommended that Phipps's request for a disbursement of Fund monies be denied.

Thereafter, the district court reviewed *de novo* the parties' arguments and supporting evidence. In an order filed December 6, 2012, the court adopted the Special Master's report and recommendation in full. The court emphasized that Lead Counsel had requested "a maximum of $72 million" in fees, which constituted 7.8 percent of the $918 million in total settlement proceeds, taking into account producers and non-producers, as well as state-court recoveries. The court found that this amount was "reasonable based on case law and [the court's] own analysis of the complexity and amount of work performed by common benefit attorneys in this case." The court found that "the number of hours charged by the common benefit attorneys, as set out in the various briefs and exhibits, [wa]s fair and reasonable." The court also found that the hourly rates used to calculate the requested lodestar awards were

acceptable. The court noted that Lead Counsel and the other common benefit attorneys had "submitted declarations of independent, prominent attorneys from their areas, who agree[d] that those hourly rates [we]re reasonable."

As recommended by the Special Master, the court denied Phipps's request for discovery regarding the individual billing records of Lead Counsel. The court found that "an in-depth examination of individual time sheets is not necessary given the sworn declarations of plaintiffs' co-lead counsel regarding the procedures used in analyzing those time sheets."

The court also denied Phipps's request for a distribution from the Fund. The court "conclude[d] that the work done by the Phipps Group for its own clients did not benefit the rest of the plaintiffs, while the work performed by the common benefit attorneys definitely benefitted the Phipps Group and its clients." The court found that Phipps's "conduct may have actually interfered with the progress of the case and the settlement" because, for instance, the court "was twice required to consider requests for sanctions when the Phipps Group improperly attempted to solicit as clients plaintiffs who were already represented by other counsel."

In sum, the court ordered fees of $51,584,012.54 and expenses of $5,468,450.26 paid to Lead Counsel and other common benefit attorneys and $1,355,594.74 returned to Hare Wynn from the Fund. The court then ordered that any remaining amounts in the Fund, up to a total of $72 million in fees, be paid to the six law firms recognized by the Special Master for their special contributions.

On appeal, Phipps challenges the district court's 2010 Order, asserting that the court lacked authority to establish a common benefit trust fund and that it erred in ordering Phipps to contribute to the Fund. Phipps also disputes the district court's 2012 Order disbursing fees and expenses from the Fund. Phipps contends that the district court abused its discretion in conducting the process by which it approved

disbursements, and erred in denying Phipps's request for a disbursement of monies from the Fund. Lead Counsel, on behalf of all common benefit attorneys, cross-appeal, arguing that the district court should have exercised jurisdiction to order state-court plaintiffs to contribute to the MDL Fund.

## II.

### A.

Lead Counsel raise a threshold challenge to Phipps's appeal of the district court's 2010 Order establishing the Fund and ordering Phipps to contribute. They contend that Phipps has no standing to challenge the 2010 Order, because Phipps agreed to be bound by the Settlement Agreement. The Settlement Agreement provides that all payments to Phipps's clients will be made as if the 2010 Order applied, including the requirement that 11 percent of the payments be directed to the Fund. Phipps responds that it has contested creation of the Fund throughout the litigation and urges us to dismiss the standing question out of hand.

The issue is better described as one of waiver and estoppel than of standing, but we conclude that the point is a serious one. Phipps, as Enrolling Counsel for its Enrolled Claimants, agreed "to be bound by all of the terms and conditions of th[e] Agreement." App. 1018 (§ 2.5). That agreement is effective based on Phipps's conduct of submitting claims pursuant to the Agreement, even though Phipps was not a party to the underlying lawsuit or the settlement agreement. *Skelton v. Gen. Motors Corp.*, 860 F.2d 250, 259 (7th Cir. 1988).

One term of the Settlement Agreement is that "[a]ll payments to Enrolled Claimants . . . under this Settlement Agreement *shall be made as if Judge Perry's February 24, 2010 Common Benefit Fund Order applied to those claims*," including that 8 percent of all payments to the Enrolled Claimants be paid to the Fund for

-10-

attorneys' fees and 3 percent of all payments be directed to the Fund for costs and expenses incurred by attorneys providing a common benefit. App. 1059 (§ 8.1.1) (emphasis added). Phipps says that this "conditional language" was not acquiescence in the district court's order, but it was an express provision that when Phipps submitted claims on behalf of its Enrolled-Claimant clients, 11 percent of the payments due from Bayer would go to the Fund in accordance with the 2010 Order. Phipps acknowledges that the settlement payments have been allocated in this manner. R. Doc. 4839-4, at 3 (¶ 7).

A party typically cannot "have it both ways" by accepting benefits of a settlement agreement while attempting to avoid its burdens. *Skelton*, 860 F.2d at 260. Putting aside that difficulty, Phipps nowhere purported to reserve the right to challenge the 2010 Order. Although Phipps objected earlier to the establishment of the Fund and the requirement that Phipps must contribute to the Fund, Phipps did not attempt to memorialize those objections in the Settlement Agreement. *See Wray v. Clarke*, 151 F.3d 807, 809 (8th Cir. 1998). If the Settlement Agreement did not resolve the disputes underlying the 2010 Order, then Phipps should not have stipulated that payments would be allocated as if the 2010 Order applied, without attempting to reserve allegedly unresolved issues. *Young v. Powell*, 729 F.2d 563, 567 n.3 (8th Cir. 1984).

We conclude that the Settlement Agreement, by which Phipps agreed to be bound, resolved that a percentage of payments due to clients of Phipps would be allocated to the Fund in accordance with the 2010 Order. Therefore, Phipps waived its challenge to the creation of the Fund and to the order that Phipps and its clients must contribute to the Fund. *See S & O Liquidating P'ship v. CIR*, 291 F.3d 454, 459 (7th Cir. 2002); *In re Factor VIII or IX Concentrate Blood Prods. Litig.*, 159 F.3d 1016, 1020 (7th Cir. 1998).

B.

Phipps also challenges, on procedural and substantive grounds, the disbursements made to Lead Counsel and other common benefit attorneys in the district court's 2012 Order. *See Cent. R.R. & Banking Co. v. Pettus*, 113 U.S. 116, 124-25 (1885). The decision to award or deny attorneys' fees rests within the sound discretion of the district court. *Wescott Agri-Products, Inc. v. Sterling State Bank, Inc.*, 682 F.3d 1091, 1094 (8th Cir. 2012); *see also Walitalo v. Iacocca*, 968 F.2d 741, 747 (8th Cir. 1992). We give substantial deference to a district court's determinations, in light of the district court's superior understanding of the litigation. *Fox v. Vice*, 131 S. Ct. 2205, 2216 (2011); *see Wescott*, 682 F.3d at 1094.

The district court did not abuse its discretion by denying Phipps's request for additional procedures before the Fund monies were disbursed. The court was permitted to rely on the summaries and affidavits presented to the court by Lead Counsel and other common benefit attorneys. "In large cases, especially one of prodigious proportions like this, reliance on summaries is certainly within the discretion of the district court." *See In re Diet Drugs*, 582 F.3d 524, 539 (3d Cir. 2009). The court did not merely rely on counsel to evaluate their own fee requests, but invited, considered, and addressed attorneys' objections to the proposed award.

The district court's review here was substantially more thorough than the procedure disapproved in *In re High Sulfur Content Gasoline Products Liability Litigation*, 517 F.3d 220 (5th Cir. 2008). In that case, a district court abused its discretion by determining a fee allocation in an *ex parte* hearing, accepting lead counsel's proposed order sealing the individual awards, and limiting its own review of objections to the allocation. *Id.* at 223-25. "[N]o affidavits were filed attesting to the accuracy or fairness of the proposed fee allocation," and the court "set forth no factual findings and reasons to support its awards of individual attorneys' fees." *Id.* at 229.

Here, by contrast, the court appointed a Special Master to review the fee request, and the Special Master invited and considered the objections of plaintiffs' attorneys, met with the parties, and reviewed the affidavits submitted by Lead Counsel and other common benefit attorneys. *See In re High Sulfur Content Gasoline Prods. Liab. Litig.*, 384 F. App'x 299, 300-01 (5th Cir. 2010) (per curiam) (approving similar procedures). Although the court did not appoint an external auditor or permit discovery, *cf. In re Diet Drugs*, 582 F.3d at 533-34, discovery in connection with fee motions is rarely permitted, *In re Prudential Ins. Co. Am. Sales Practices Litig.*, 148 F.3d 283, 338 (3d Cir. 1998), and a "request for attorney's fees should not result in a second major litigation." *Hensley v. Eckerhart*, 461 U.S. 424, 437 (1983). We cannot say that the procedures employed by the district court were an abuse of discretion.

The district court likewise did not abuse its discretion by approving the requested award as substantively reasonable. The court permissibly approved the lodestar-based fee request and cross-checked that fee's reasonableness by determining the fee as a percentage of the total recovery. The approved disbursements of up to $72 million in fees plus expenses, amounting to approximately 8.4 percent of the total recovery for all plaintiffs, were within the range of awards made in similar cases. *See In re Avandia Mktg., Sales Practices and Prods. Liab. Litig.*, MDL 1871, 2012 WL 6923367, at *6 (E.D. Pa. Oct. 19, 2012) (7 percent assessment was "substantially similar to assessments . . . made in other cases," which "in recent years have ranged between 3% and 12%"); William B. Rubenstein, *On What a 'Common Benefit Fee' Is, Is Not, and Should Be*, 3 Class Action Att'y Fee Dig. 87, 90, 92 (2009) (of twenty-one reported cases, almost all had common benefit assessments of approximately 4 to 6 percent, but three others had awards of 8 to 9 percent, and there was one at 12 percent and another at 18 percent); *id.* at 91 ("I emphasize the 4-6% figures solely because they are most commonly used. That alone doesn't mean that they are on target.").

It was permissible for the court, under the circumstances here, to cross-check the percentage of recovery by using the full settlement amount for both MDL and non-MDL litigants. The district court found that the state-court cases, "including the cases in which the Phipps Group was counsel, benefitted greatly from the work performed by the common benefit attorneys." Lead Counsel's work was made available to all plaintiffs; state-court bellwether trials were included as part of Lead Counsel's overarching strategy; and at least one state court recognized the benefit of Lead Counsel's work to the litigants before it. App. 1322. Although the district court could not order state-court plaintiffs to contribute to the Fund, it was reasonable for the court to exercise its managerial power to ensure that Lead Counsel and the other common benefit attorneys were fully compensated for work that assisted other parties, within the limits of the contributions to the Fund agreed upon in the Settlement Agreement.

The district court's rationale for approving the fee request was reasonable as well. The court, adopting the Special Master's analysis, "fulfilled its responsibility of providing a concise but clear explanation of its reasons for the fee award." *Hardman*, 714 F.2d at 825 (internal quotation, citation, and alteration omitted); *see Johnson*, 488 F.2d at 717-19. The Special Master's report discussed the relevant factors, including "the time and labor required," "[t]he novelty and difficulty of the questions," "[t]he skill requisite to perform the legal service properly," "[t]he amount involved and the results obtained," and the "length of the professional relationship with the client." The Special Master noted that the MDL litigation lasted longer than five years, required international discovery, involved thousands of plaintiffs and hundreds of lawyers, included several bellwether trials, and raised novel and complex issues of law. Where, as here, the attorneys' fees awarded were within the high end of the range of fees approved in similar cases, and the district court set forth permissible reasons for awarding the fees, we cannot say that the court abused its discretion.

-14-

Phipps also challenges the denial of its request for a benefit award, but we see no abuse of discretion. The district court agreed with the Special Master that Phipps worked "separate and apart" from the leadership group, "did not share the benefit of [its] experts or [its] opinions," and "never . . . attempt[ed] to co-ordinate [its] activities with those of Lead Counsel." The court also determined that there was "no basis in law or fact" for Phipps's claim that its state-court lawsuits pressured Bayer to settle with the MDL plaintiffs. In fact, the court found that Phipps's efforts may have had a direct negative impact on the MDL plaintiffs' coordinated litigation. While it is possible that lawyers may create bargaining leverage over a defendant by refusing to join an MDL and litigating in multiple fora, the district court was not automatically required to accept that Phipps did so here. To accept Phipps's position would reduce incentives to collaborate with leadership counsel and could frustrate the purposes of the MDL statute to promote efficiency and coordination. 28 U.S.C. § 1407.

The district court here was intimately involved with the MDL rice litigation for many years, and witnessed directly the contributions and efforts of the attorneys before it. In light of that experience, the deference we owe to a district court's determination of attorneys' fees, and Phipps's lack of collaboration with the leadership group in this case, we cannot say that the district court abused its discretion by denying Phipps's request for fees from the Fund.

III.

Lead Counsel, on behalf of all common benefit attorneys, cross-appeal the district court's determination that it lacked jurisdiction to order holdbacks from state plaintiffs' recoveries. We conclude that Lead Counsel have standing to pursue the cross-appeal. The district court's determination caused Lead Counsel injury-in-fact,

because they received less money than they could have received if the district court had ordered state-court plaintiffs to contribute to the Fund. The court awarded Lead Counsel up to $72 million in fees, but the amounts in the Fund will not cover the approved award. Holdbacks from state-court plaintiffs would thus benefit Lead Counsel.

The district court properly ruled, however, that it did not have jurisdiction to order holdbacks from state-court plaintiffs' recoveries. Lead Counsel assert no independent basis for jurisdiction over these state-court actions. Although district courts have discretion in orchestrating and conducting multi-district litigation, "[t]he authority for consolidating cases on the order of the judicial panel on multi-district litigation . . . is merely procedural and does not expand the jurisdiction of the district court to which the cases are transferred." *In re Showa Denko K.K. L-Tryptophan Prods. Liab. Litig.-II*, 953 F.2d 162, 165 (4th Cir. 1992). Thus, notwithstanding 28 U.S.C. § 1407, the district court does not have the power to order parties in cases not before it to contribute to the Fund. *See id.* at 166; *Hartland v. Alaska Airlines*, 544 F.2d 992, 1001 (9th Cir. 1976).

Lead Counsel argue that the assessments need not be levied on the state-court plaintiffs themselves, but rather may be withheld by Bayer (a party before the district court) or paid by the plaintiffs' counsel (some of whom represent clients in the MDL). Lead Counsel assert that the court has jurisdiction over Bayer and MDL attorneys, so the court can order withholding from their "related" state-court cases. But state-court cases, related or not, are not before the district court. The state-court plaintiffs at issue neither agreed to be part of the federal MDL nor participated in the MDL Settlement Agreement. Even if the state plaintiffs' *attorneys* participated in the MDL, the district court overseeing the MDL does not have authority over separate disputes between state-court *plaintiffs* and Bayer.

Lead Counsel also urge that the state-court plaintiffs' counsel benefited from the MDL leadership group's work, so equity requires that they contribute to the Fund. But equity is insufficient to overcome limitations on federal jurisdiction. The district court correctly held that it lacked jurisdiction to order holdbacks from the state-court recoveries.

\* \* \*

The judgment of the district court is affirmed.

———————————————————