RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 25a0322p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

IN RE: EAST PALESTINE TRAIN DERAILMENT

_____

MORGAN & MORGAN,

        *Interested Party-Appellant,*

    *v.*

ZOLL & KRANZ, LLC; BURG SIMPSON ELDREDGE
HERSH & JARDINE, P.C.; GRANT & EISENHOFFER, P.A.;
SIMMONS HANLY CONROY; LIEFF CABRASER HEIMANN
& BERNSTEIN, LLP,

        *Interested Parties-Appellees.*

No. 24-4086

Appeal from the United States District Court for the Northern District of Ohio at Youngstown.
No. 4:23-cv-00242—Benita Y. Pearson, District Judge.

Argued:  October 23, 2025

Decided and Filed:  November 25, 2025

Before:  THAPAR, READLER, and HERMANDORFER, Circuit Judges.

_____

## COUNSEL

**ARGUED:**  Aaron M. Herzig, TAFT STETTINIUS & HOLLISTER LLP, Cincinnati, Ohio, for Appellant.  Paul D. Clement, CLEMENT & MURPHY, PLLC, Alexandria, Virginia, for Appellees.  **ON BRIEF:**  Aaron M. Herzig, TAFT STETTINIUS & HOLLISTER LLP, Cincinnati, Ohio, David C. Roper, TAFT STETTINIUS & HOLLISTER LLP, Columbus, Ohio, for Appellant.  Paul D. Clement, Matthew D. Rowen, Kyle R. Eiswald, CLEMENT & MURPHY, PLLC, Alexandria, Virginia, for Appellees.

      READLER, J., delivered the opinion of the court in which THAPAR and HERMANDORFER, JJ., concurred.  THAPAR, J. (pp. 17–23), delivered a separate concurring opinion.

---

**OPINION**

---

READLER, Circuit Judge.  The derailment of 38 cars in a Norfolk Southern freight train in early 2023 upended the quiet Columbiana County (Ohio) community of East Palestine.  With the train carrying hundreds of thousands of gallons of hazardous materials, the derailment stoked fires that billowed for days.  Those combustions were followed by additional "controlled releases" that resulted in a "toxic mushroom cloud" of chemicals.  Am. Master Complaint, R. 138, PageID 1804, 1805–06.  To some observers, the incident "looked like something out of Chernobyl."  *See* Salena Zito, *'We Don't Know What We Are Breathing': A Report from East Palestine*, The Free Press (Feb. 23, 2023), https://perma.cc/T4J5-CCBW.  Thousands were evacuated from the area, with fears growing over potential health, environmental, and economic fallout from the accident.

Within days of the accident, lawsuits ensued against Norfolk Southern.  The cases, filed on behalf of numerous affected individuals and businesses, were eventually consolidated into one master class action.  In the end, a $600 million settlement was forged between the parties, which the district court ultimately approved.  *See In re E. Pal. Train Derailment*, --- F. 4th ---, Nos. 24-3852, 24-3880, 25-3342, 2025 WL 3089606, at *1 (6th Cir. Nov. 5, 2025).

Today's case, however, does not directly concern the victims of the derailment or the settlement they achieved.  Instead, it involves the lawyers who sued Norfolk Southern.  The dispute here involves a late-breaking fight over the timing and allocation of attorney's fees.  Weeks after the district court gave final approval of the settlement and fees, Morgan & Morgan—a law firm that represented a group of individuals and entities who had filed standalone cases against Norfolk Southern—challenged the distribution of attorney's fees.  Despite having been awarded nearly $8 million in attorney's fees (and receiving those fees at an expedited pace), Morgan & Morgan took issue with the process for awarding those fees.  In the end, the district court refused to undo its earlier decisions.  We largely agree.  Save for a narrow issue as to Morgan & Morgan's specific allocation of the total fee award, which we remand for consideration by the district court, we affirm.

I.

In the aftermath of the derailment of a Norfolk Southern train in East Palestine, a number of class action and individual complaints were filed against the railroad and related entities. Among the claimants were residents, property owners, employees, and businesses affected by the accident. After seeking the parties' input on whether to proceed as a single class action, the district court consolidated the related cases under Federal Rule of Civil Procedure 42 and authorized the filing of a master consolidated class action complaint joining the claims from those cases. In that same order, the district court also addressed the leadership structure for the plaintiffs' attorneys. It appointed three attorneys as interim class counsel to act on behalf of the putative class prior to certification. The court further designated those three attorneys, together with T. Michael Morgan of Morgan & Morgan, P.A., as co-lead counsel, a court-created management role responsible for coordinating both the class and individual actions. (Unless otherwise noted, we will refer to Morgan and his firm collectively as "Morgan & Morgan."). Next, the court approved certain guidelines proposed by co-lead counsel for tracking attorney "time and effort[]" expended for the class during the litigation. R. 33, PageID 788.

From there, litigation began apace. Co-lead counsel filed a master class action complaint in May 2023, which was followed by early motions practice and the start of discovery. As the discovery process unfolded, attorneys for the plaintiffs (including Morgan & Morgan) and Norfolk Southern began to negotiate a potential settlement, aided by a series of mediation sessions before a former federal judge. Months of engagement resulted in the execution of a settlement agreement in April 2024.

The agreement required Norfolk Southern to establish a $600 million settlement fund in exchange for the release of all past, present, or future claims or causes of action arising from the train derailment by all persons and businesses within a defined settlement class. The "sole" exception to that release was for personal-injury claims, which class members could voluntarily elect to release for an additional payment. R. 452-2, PageID 6012. The settlement fund would then be allocated to the settlement class, save for any administrative expenses, attorney's fees and costs, and service awards for the class representatives. The agreement reflected that a settlement administrator would distribute the bulk of the settlement funds to claimants once all

appeals as to class certification and the settlement agreement were resolved.  As to attorney's fees and costs, the settlement contemplated a different course:  Class counsel would petition the court for a fee award, and any approved fee award would be paid under a so-called "quick pay provision"—a mechanism that allows plaintiffs' counsel to be paid soon after district court approval of the settlement (here, 14 days) even while the settlement is still subject to appeal.  At the same time, the agreement recognized that if the settlement was terminated by the parties or otherwise altered in any material respect on appeal, the attorneys would be required to return any fees and costs (plus interest) to Norfolk Southern within 14 days.  Should any dispute arise out of the settlement—including any dispute over attorney's fees and costs "amongst counsel"—the settlement understood the district court to retain jurisdiction to resolve the dispute.

At least initially, resolution of the attorney's fees allocation was uneventful.  All four co-lead counsel, including Morgan & Morgan, signed the settlement agreement.  The district court thereafter preliminarily approved the settlement and appointed the three co-lead counsel representing the proposed class as class counsel for the settlement class.  The court also set July 1, 2024, as the deadline to lodge any objections to the settlement.  That day came and passed with no objections by any of plaintiffs' counsel (including Morgan & Morgan).  In early September, co-lead class counsel and Morgan & Morgan jointly moved the district court to grant final approval of the proposed settlement and award attorney's fees equaling 27% of the total recovery.  In an affidavit attached to one of the motions, T. Michael Morgan attested to his "full[] support" for the settlement and the application for attorney's fees, and maintained that the settlement was "fair, adequate, and reasonable."  R. 518-9, PageID 11184.  In response to an objection to how the attorney's fees would be distributed, all four co-lead counsel proposed language that, in line with other settlements, authorized co-lead class counsel (in other words, all co-lead counsel save for Morgan & Morgan) to "distribute the fees in a manner that, in the judgment of Co-Lead Class Counsel, fairly compensates each firm for its contribution to the prosecution of Plaintiffs' claims."  R. 538, PageID 12344–45, 48–49; R. 538-5, PageID 12399–400.

With this framework in place, the district court turned to examining the settlement and the requests for fees.  It began by holding a fairness hearing.  With T. Michael Morgan in

attendance, co-lead class counsel argued in favor of the attorney's fee application. In addressing objections concerning the allocation of attorney's fees, co-lead class counsel asked the district court to follow the "well-established principle that . . . appointed class counsel[] are best suited to apportion fees to those firms who perform work that benefited the class." R. 553, PageID 14523. The district court did so. In orders issued on September 27, 2024, the court gave final approval to the settlement and, separately, approved the fees application, including the proposed language in the approval order regarding co-lead class counsel's authority to allocate fees among plaintiffs' counsel. The order approving the settlement explained that the court would retain jurisdiction to "resolv[e] issues relating to or ancillary to" the settlement, including "ensuring compliance" with the settlement and any connected court orders. R. 557, PageID 14586.

In line with the settlement's quick pay provision, co-lead class counsel began allocating fees among the 39 plaintiffs' firms. Allocations were finalized by the end of the first week of October, and distributions largely followed thereafter. Class counsel assessed Morgan & Morgan's share of the fees at $7,723,709.87.

Following this long, unbroken chain of agreement, an unexpected disagreement arose. Four weeks after the district court gave final approval to the settlement and the fee application, Morgan & Morgan asked the court to reconsider some of its earlier rulings. Specifically, the firm moved to "enjoin the distribution of attorney fees pending the resolution of appeals, and to amend the fee [o]rder . . . and appoint Co-Lead Counsel T. Michael Morgan to participate in the allocation process." R. 664, PageID 46330. Morgan & Morgan's motion challenged the settlement's previously approved quick pay provision as well as the authority of co-lead class counsel to make allocation determinations among the firms. The firm also suggested that there may be issues with its individual fee award, maintaining that the allocation process lacked transparency, leaving it "unclear whether all approved hours have been compensated in the allocation process." R. 664-1, PageID 46343. Morgan & Morgan's filing prompted the district court to hold a telephonic conference, where Morgan & Morgan raised additional concerns about its distribution amount. For support, the law firm, working from the total number of hours that class counsel had provided, posited that there was a "$20 million deficit" from what the total "lodestar hours" submitted by all 39 firms "would be paid out at." R. 986, PageID 68879–80. A

few weeks later, the district court issued an order denying Morgan & Morgan's motion. Morgan & Morgan's timely appeal followed. In the meantime, we have resolved the remaining objector appeals challenging the underlying settlement and fee award, leaving only Morgan & Morgan's appeal pending before us. *See In re E. Pal. Train Derailment*, 2025 WL 3089606, at *1, 3.

## II.

Morgan & Morgan contends that the district court erred in three respects: by approving the settlement's quick pay provision, authorizing co-lead class counsel to oversee the allocation of attorney's fees among the plaintiffs' firms, and failing to scrutinize co-lead class counsel's underlying calculations, which purportedly undervalued Morgan & Morgan's contribution to the litigation.

A. We begin where Morgan & Morgan does, taking up first its challenge to the quick pay provision. Before we can consider the merits of Morgan & Morgan's argument, however, we must assure ourselves that Morgan & Morgan has demonstrated its standing to press the argument. *See TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2208 (2021). Article III of the Constitution limits federal courts to decide "Cases" or "Controversies," U.S. CONST. art. III, § 2, a phrase well understood to require that the party invoking the power of a federal court have a "personal stake" in the case, *TransUnion LLC*, 141 S. Ct. at 2203; *Hollingsworth v. Perry*, 570 U.S. 693, 707 (2013). Typically, the standing inquiry is focused on the plaintiff and the relief that party seeks. Here, of course, Morgan & Morgan was not the party that commenced the litigation. But it bears remembering that standing must also be "met by persons seeking appellate review," here Morgan & Morgan, "just as it must be met by persons appearing in courts of first instance." *Hollingsworth*, 570 U.S. at 705 (quoting *Arizonans for Off. Eng. v. Arizona*, 520 U.S. 43, 64 (1997)). In practice, that means Morgan & Morgan must show that the settlement's quick pay provision has caused the firm to suffer a "concrete, particularized, and actual or imminent" injury that is fairly traceable to the challenged conduct and likely to be redressed by a favorable ruling on appeal. *TransUnion LLC*, 141 S. Ct. at 2203; *Hollingsworth*, 570 U.S. at 704.

To our minds, Morgan & Morgan lacks standing to pursue its challenge to the quick pay provision.  Influential in that conclusion is the counterintuitive nature of Morgan & Morgan's purported harm tied to the timing of the attorney's fees payment:  The firm claims an injury from receiving its fees "right away" via the quick pay provision, as opposed to having to wait a year or more to receive what it is owed.  Appellant Br. 23.  Morgan & Morgan's asserted injury—tied to the timing of when its fees are paid—runs counter to a basic principle of finance, namely, that a dollar today is worth more than a dollar tomorrow.  *See generally* Irving Fisher, *The Theory of Interest* (1930).  If anything, Morgan & Morgan is "better off" with the quick pay provision than without it, which undermines its claim that it has a concrete, actual injury justifying its standing.  *See In re Flint Water Cases*, 63 F.4th 486, 505 (6th Cir. 2023) (emphasis omitted) (objectors who are better off under the terms of the settlement than without it lack standing to challenge the settlement).

Cementing our conclusion is the fact any harm the firm suffered was a result of its own doing.  Recall that Morgan & Morgan helped negotiate the settlement with the quick pay provision, later signed the agreement memorializing that settlement, and then separately attested to its "full[] support" for the settlement and fee award.  R. 518-9, PageID 11184.  In other words, if Morgan & Morgan was injured by the inclusion of a quick pay provision in the settlement agreement, it has only itself to blame for procuring that result.  With any injury here self-inflicted, Morgan & Morgan's alleged harms are "not traceable to anyone but the" party seeking judicial relief.  *Buchholz v. Meyer Njus Tanick, PA*, 946 F.3d 855, 866 (6th Cir. 2020).

Morgan & Morgan's rejoinders run up against decades of Article III standing jurisprudence.  The firm first maintains that the quick pay feature "jeopardize[s] their clients' ability to recover money."  Appellant Br. 23.  At the outset, it is not entirely clear why this provision puts at risk the class's recovery, with no other objections to the settlement remaining before this Court and with Morgan & Morgan agreeing that any objections other than its own would be meritless.  *See In re E. Pal. Train Derailment*, 2025 WL 3089606, at *1, 3; *see also* Appellant Br. 23 (Morgan & Morgan conceding the "settlement and cumulative fee award are fair").  But even accepting the firm's assertion, it is not enough for Morgan & Morgan to demonstrate its standing to pursue this appeal.  The firm, remember, must show an injury that is

personal to it—not third parties like its clients.  *See FDA v. All. for Hippocratic Med*., 144 S. Ct. 1540, 1563 n.5 (2024) (observing that parties lacking any injury cannot "shoehorn themselves into Article III standing simply by showing that [the third parties they represent] have suffered injuries or may suffer future injuries"); *see also Hollingsworth*, 570 U.S. at 708.

Morgan & Morgan has not done so.  Take, for instance, the firm's contention that class counsel misallocated fees, depriving Morgan & Morgan of their claimed full allotment. Intuitively, at least, that would appear to be an injury the firm has standing to pursue.  *See Weeks v. Indep. Sch. Dist. No. I-89*, 230 F.3d 1201, 1207 (10th Cir. 2000) ("Counsel have standing to appeal orders that directly aggrieve them"); *In re Volkswagen "Clean Diesel" Mktg., Sales Pracs., & Prods. Liab. Litig*., 914 F.3d 623, 640 (9th Cir. 2019) ("deprivation of attorneys' fees" amounts to an injury in fact).  Yet it is unclear how that injury affords the firm standing to challenge the quick pay provision, which arguably benefits Morgan & Morgan, and which the firm embraced over a long stretch of the settlement litigation.  Morgan & Morgan must demonstrate standing for "each claim [it] seeks to press," *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006), and may not bootstrap a remedy (here, delaying when fees are distributed) that fails to relieve the injury complained of (here, insufficient compensation), *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 107 (1998).

Equally unavailing is Morgan & Morgan's assertion that delaying fee allocations until after all appeals in the litigation are exhausted would avoid "hypothetical[]" harms, Reply Br. 15, like the firm having to repay monies it was awarded in fees or the firm losing out on fees that it was owed but paid to another firm.  These "conjectural or hypothetical" injuries are insufficient to establish an injury-in-fact, *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992) (citation modified), especially as they are based on a "chain of contingencies," *see Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 410 (2013).  That conclusion is especially apt here.  After all, with no other firm challenging the allocation decision and the objector appeals now resolved, the uncertainties Morgan & Morgan highlights are all but ruled out.  *See In re E. Pal. Train Derailment*, 2025 WL 3089606, at *1, 3; *see also Clapper*, 568 U.S. at 401 (requiring that any risk of future injury be "certainly impending").  And the distributions to other plaintiffs' counsel have already occurred.  So even if the hypothetical harms that flow from unwinding the

distributions count as an injury-in-fact, those injuries are now inevitable no matter how we rule. That reality raises separate Article III mootness concerns. *See Uzuegbunam v. Preczewski*, 141 S. Ct. 792, 796 (2021) ("[I]f in the course of litigation a court finds that it can no longer provide a plaintiff with any effectual relief, the case generally is moot").

All told, Morgan & Morgan lacks standing to challenge the quick pay provision, leaving us without jurisdiction to reach the claim's merits.

B. Shifting from the settlement agreement, Morgan & Morgan next focuses on the fee award order. Specifically, the firm challenges the denial of its reconsideration motion filed under Federal Rules of Civil Procedure 59(e), 60(b)(1), and 60(b)(6), which sought to undo co-lead class counsel's authority to allocate fees among the various plaintiffs' attorneys. We review the district court's denial of Morgan & Morgan's reconsideration motion for an abuse of discretion, which means that the firm, to be deserving of relief, must leave us with a "definite and firm conviction that the district court committed a clear error in judgment." *U.S. ex rel. Angelo v. Allstate Ins. Co.*, 106 F.4th 441, 453 (6th Cir. 2024) (citation modified) (reviewing motions under Rule 59(e) and Rule 60(b)(1)).

We see no obvious error in the district court's refusal to amend its order and judgment on fee allocation. The Federal Rules of Civil Procedure authorize at least two vehicles for seeking what, in effect, amounts to reconsideration of a court's final judgment. *See* Fed. R. Civ. P. 59(e) (motion to alter or amend a judgment); *see also* Fed. R. Civ. P. 60(b); *Banister v. Davis*, 140 S. Ct. 1698, 1710 n.9 (2020) (recognizing that Rule 60(b) motions filed within 28 days of final judgment are commonly treated as Rule 59(e) motions). In either case, a reconsideration motion, given its post-decision posture, is typically not a vehicle to present new arguments that could have been raised prior to the court's dispositive decision. *See Roger Miller Music, Inc. v. Sony/ATV Publ'g, LLC*, 477 F.3d 383, 395 (6th Cir. 2007) (Rule 59(e)); *Jinks v. AlliedSignal, Inc.*, 250 F.3d 381, 385 (6th Cir. 2001) (Rule 60(b)).

Yet that aptly describes Morgan & Morgan's approach in district court. Recall the underlying sequence of events. The request to provide co-lead class counsel with fee allocation authority first surfaced in a brief and proposed order submitted on September 23, 2024, by

plaintiffs' counsel, including T. Michael Morgan. The filing was publicly available, and it was likewise sent to more than half a dozen Morgan & Morgan associated email addresses, including the one assigned to T. Michael Morgan. Morgan & Morgan, however, never objected to the proposed language. Two days later, T. Michael Morgan attended the fairness hearing, where co-lead class counsel argued for empowering class counsel to apportion fees to the plaintiffs' firms. Rather than objecting to the proposal, Morgan stayed quiet. Indeed, Morgan's lone injection into the hearing was to wave at the district court to note his presence. R. 553, PageID 14429 ("THE COURT: Mr. Morgan, will you gesture? MR. MORGAN: (Indicating.).") In other words, the firm was given ample access to the proposal in advance of the fairness hearing and had a front row seat to the discussion over the proposal. Yet it was not until four weeks after the district court's approval of the proposal that Morgan & Morgan raised an objection. Taking all of these developments into consideration, it is fair to view Morgan & Morgan as having endorsed the purportedly offending fee allocation provision, only to reverse course weeks later. Under these circumstances, the district court appropriately exercised its judgment in rejecting the firm's belated objection. *See Leisure Caviar, LLC v. U.S. Fish & Wildlife Serv.*, 616 F.3d 612, 616 (6th Cir. 2010).

Doubly so when one considers the merits of the firm's position. While it is undoubtedly the case that, as Morgan & Morgan emphasizes, "courts must carefully scrutinize" how settlements fees are "allocated between the class representatives, class counsel, and unnamed class members," *In re Dry Max Pampers Litig.*, 724 F.3d 713, 717–18 (6th Cir. 2013), the district court nonetheless retains significant discretion in how it exercises that oversight, *see Gascho v. Glob. Fitness Holdings, LLC*, 822 F.3d 269, 286 (6th Cir. 2016). One well-accepted approach is to initially allow lead counsel to apportion fees among the plaintiffs' various representatives, while the district court retains jurisdiction to scrutinize apportionment decisions and adjudicate disputes if and when they arise. *See* 5 William Rubenstein, *Newberg and Rubenstein on Class Actions* § 15:23 (6th ed. Supp. 2025). This approach presumes that firms that organized or led the negotiations are best situated to assess the relative contributions of each lawyer and firm to the overall settlement. *See id*; Edward K. Cheng, Paul H. Edelman & Brian T. Fitzpatrick, *Distributing Attorney Fees in Multidistrict Litigation*, 13 J. Legal Analysis 558, 560 (2021) (noting dearth of research on the topic of allocation of fees "amongst the group" of

attorneys, but noting that the "lead lawyer often divides the fees"); *see also In re Vitamins Antitrust Litig.*, 398 F. Supp. 2d 209, 224 (D.D.C. 2005) (collecting cases); *In re Prudential Ins. Co. Am. Sales Prac. Litig. Agent Actions*, 148 F.3d 283, 329 n.96 (3d Cir. 1998); *In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516, 533 n.15 (3d Cir. 2004); *In re Life Time Fitness, Inc.*, 847 F.3d 619, 623–24 (8th Cir. 2017).

True, other options were available to the district court, from refusing to delegate any allocation authority to appointing a special master or an external auditor to oversee the process. *See, e.g.*, Fed. R. Civ. P. 23(h)(4); *In re Genetically Modified Rice Litig.*, 764 F.3d 864, 872 (8th Cir. 2014). But that the district court opted here for the tried and true "trust but verify" approach, *see* President Ronald Reagan, Farewell Address to the Nation (Jan. 11, 1989), https://perma.cc/ZCS7-3HBS, allowing counsel to take the first crack at a fee allocation subject to court review later on, does not by itself reflect an abuse of discretion, *see In re Genetically Modified Rice Litig.*, 764 F.3d at 872. That is especially true when Morgan & Morgan does not contend that the attorney's fees allocation here affected the class's distribution, no remaining objections to the settlement are pending before us, and none of the other plaintiffs' firms have objected to the allocation decisions. *See In re Dry Max Pampers Litig.*, 724 F.3d at 718 (holding lack of deference in allocation decisions is warranted to protect the class); *In re Life Time Fitness, Inc.*, 847 F.3d at 623–24 (recognizing that the lack of a dispute among class counsel over how to allocate the award of attorney's fees and expenses suggests no abuse of discretion in delegating allocation authority).

Morgan & Morgan's responses are unavailing. The firm begins with an ethical concern, namely, that T. Michael Morgan's signature was attached to the September 23, 2024, reply brief and proposed order without his knowledge or permission. That is a serious accusation. But its veracity is far from certain. The district court expressed skepticism. And the record, in this posture, does not allow us to credit Morgan & Morgan's claims and second guess the district court. *See* Oral Argument Tr. at 24:03–25:10 (discussing the circumstances of the filing). What we do know is that the September 23 filing was publicly available, emailed to Morgan at the time of the filing, and discussed at the fairness hearing (with Morgan in attendance) days later. All of

this leaves it hard to understand why a sophisticated entity like Morgan & Morgan would wait weeks to object to a fraudulent signature.

Next, Morgan & Morgan contends that the district court failed to sufficiently explain the reasoning behind its delegation decision. But the record belies that assertion. The district court twice explained—both in its approval of the fee application and in the reconsideration order—that it empowered co-lead class counsel to make the initial allocation decisions due to their familiarity with the work of each firm in the litigation. That explanation could have been more robust. But all things considered, there was no need for the district court to author a dissertation "where the basis for [its] decision is obvious in light of the record." *See Mich. State AFL-CIO v. Miller*, 103 F.3d 1240, 1248 (6th Cir. 1997).

Morgan & Morgan also maintains that Rule 23 prohibits a district court from "abdicat[ing] its allocation discretion to class counsel." Appellant Br. 32. Perhaps so. But we cannot accept the premise of the law firm's argument. The district court did not wash its hands of the allocation decision. Instead, the court retained jurisdiction to "resolv[e] issues relating to or ancillary to" the settlement, including any connected orders of the court, such as the fee award. R. 557, PageID 14586. That approach—letting lead counsel initially allocate fees while "retain[ing] the ultimate power to review" any challenges to those allocations—is "neither unusual nor inappropriate" in the Rule 23 setting. *Victor v. Argent Classic Convertible Arbitrage Fund L.P.*, 623 F.3d 82, 90 (2d Cir. 2010). And it bears repeating that, outside of this dispute, no challenges arose among the various plaintiffs' firms as to the co-lead class counsel's allocation's decisions. That fact makes this case distinguishable from *In re High Sulfur Content Gasoline Prods. Liab. Litig.*, 517 F.3d 220 (5th Cir. 2008), where a district court, having determined a fee allocation in an ex parte hearing with lead counsel, later cursorily reviewed the many objections tied to the eventual allocation. *Id.* at 223–25.

Finally, Morgan & Morgan claims that at the very least it was an abuse of discretion to not allow the firm a role in making the fee allocations. But that decision was easy to rationalize. Remember, Morgan & Morgan's role in the litigation was not to represent the class, but rather to assist those who opted to file outside of the class structure. So it does not strike us as unreasonable, let alone a "clear error in judgment," to not task an attorney whose work was

adjacent to the core of the case with a central role in allocating attorney's fees.  *See Angelo*, 106 F.4th at 453 (citation modified).

C.   That leaves Morgan & Morgan's final argument, which starts where the last one left off.  Recognizing that the district court opted for the trust and verify approach to fee allocation, the law firm maintains that the court failed to "verify" co-lead class counsel's decision making by insufficiently scrutinizing the allocation to Morgan & Morgan.  We review Morgan & Morgan's challenge to its individual allocation for an abuse of discretion.  *In re Dry Max Pampers Litig.*, 724 F.3d at 717.

Critical to our resolution of this issue is the manner in which it traversed the district court.  Start with Morgan & Morgan's presentation of the issue, which was less than ideal.  Its motion and attached briefing sought to enjoin the distribution of attorney's fees pending the resolution of appeals, and to amend the fee order both to include "a process for judicial review of the fee allocation" and to appoint T. Michael Morgan to "participate in the allocation process." R.  664, PageID 46330.  Those arguments fairly captured the first two issues on appeal—the challenges to the quick pay provision and the delegation of allocation authority.  But they do not speak to the topic of Morgan & Morgan's fee allocation, the issue it presses here.  That issue was raised only later, during the telephonic hearing on Morgan & Morgan's motion.

There, the firm shifted gears.  At the district court's invitation, Morgan & Morgan confirmed that it was "concerned" with "the amount that's been allocated to" it.  R. 986, PageID 68852.  The firm began discussing "discrepancies . . . found in the allocation," specifically, the firm's belief, based on the information that had been presented by co-lead class counsel, that co-lead class counsel's shares had been artificially inflated at the expense of other firms, including Morgan & Morgan.  R. 986, PageID 68878–80.  Specifically, the law firm argued that the allocated fees were at a "$20 million deficit" from what should have been received and that excessive multipliers were used for each of class counsel's work.  *Id.* at 68880.  Co-lead class counsel responded, faulting Morgan & Morgan's "math," explaining that "no discrepancy" existed based on the nature of the hours at issue, and asserting that Morgan & Morgan's hours "were treated the same as all other firms and the Co-Lead firms."  *Id.* at 68857, 68881.  Co-lead class counsel then gestured toward filing a written response to Morgan & Morgan's claims.  But

the district court rejected the offer, assuring the parties it would "think about what [it] heard and consider" next steps.  *Id.* at 68884–85.  Two and a half weeks later, the district court denied Morgan & Morgan's reconsideration motion.

On this record, was the argument forfeited in district court, as co-lead class counsel suggest?  Had a party taken the same approach before us that Morgan & Morgan did in district court—raising a new argument for the first time at oral argument—we would be quite unlikely to entertain its merits.  *See Resurrection Sch. v. Hertel*, 35 F.4th 524, 530 (6th Cir. 2022) (en banc) (recognizing that an argument "raised for the first time" at oral argument is usually forfeited).  That said, we do not provide similar treatment to an issue raised "for the first time at a district court hearing."  *United States v. Huntington Nat'l Bank*, 574 F.3d 329, 332 (6th Cir. 2009).  District court motions practice, as exemplified by the treatment of Morgan & Morgan's motion, commonly does not follow a "rigid three-stage briefing schedule."  *Id.*  In view of the fluid nature of those lively dockets, it is not uncommon for arguments to be raised for the first time in court, rather than on paper.  *Id.*  Appreciating these differences, "litigants may preserve an argument in the district court by raising it for the first time at a hearing, even when they neglected to make the argument in a pre-hearing filing."  *Id.* (citation modified) (collecting cases); *see also Stryker Emp. Co. v. Abbas*, 60 F.4th 372, 383–84 (6th Cir. 2023); *Bard v. Brown County*, 970 F.3d 738, 749 (6th Cir. 2020).  On appeal, we assess forfeiture by considering whether the litigant "state[d] the issue with sufficient clarity to give the [district] court and opposing parties notice that it is asserting the issue."  *See Huntington Nat'l Bank*, 574 F.3d at 332.

Applying that relatively low bar, Morgan & Morgan preserved its fees distribution-based challenge in district court.  During the telephonic hearing, the firm "identified" its contention that the attorney's fees had been misallocated and "presented arguments to support [its] theory" by pointing to supposed problems with the math underlying the distributions.  *See Stryker Emp. Co.*, 60 F.4th at 384.  The parties and the court, in turn, were aware of Morgan & Morgan's issue with its fee allocation.  Co-lead class counsel responded to it directly, and the district court acknowledged that Morgan & Morgan had put forth "a general idea of the discrepancies [it] believe[s] exist in the alloc[a]tion," R. 986, PageID 68881, at which point the district court then

instructed the parties that there would be "no more filings" on the issue, *id.* at 68885. As explained next, one could fairly fault the district court for not requiring Morgan & Morgan to present its argument more formally, such as through subsequent briefing. But as to the question of preservation, under these circumstances we think Morgan & Morgan's allocation argument was fairly presented.

Turn then to the merits of the allocation argument. The parties debate at length whether the distribution process adversely affected Morgan & Morgan. The firm portrays the district court as having tacitly accepted co-lead class counsel's explanation of how allocations were made, while ignoring Morgan & Morgan's assertion that the firm played a critical role in the litigation that was not reflected in the fee allocation. Co-lead class counsel counters that the fee allocation was based on objective measures stemming from the guidelines the district court approved in the early days of litigation, when a settlement was little more than a gleam in the eye. Co-lead class counsel also highlights Morgan & Morgan's comparatively minimal role in the litigation, which, to co-lead class counsel's minds, sensibly resulted in a lower share of the fees. Co-lead class counsel further notes that the particulars of distributions among counsel become irrelevant once there is no dispute as to their collective worth, *see* Appellee's Br. at 35–36 (citing *Bowling v. Pfizer, Inc.*, 102 F.3d 777, 781 (6th Cir. 1996)), as may well be the case now that we have resolved the objector appeals, *see In re E. Pal. Train Derailment*, 2025 WL 3089606, at *1, 3.

Unfortunately, the district court never engaged with these arguments. Its order resolving allocation and distribution issues discussed only those issues that Morgan & Morgan briefed. Despite suggesting to the parties that it would consider all of the arguments presented during the telephonic hearing, the district court did not do so. While it is not at all clear that Morgan & Morgan's assertions are meritorious, the district court's failure to address them amounts to an abuse of discretion. *See Garner v. Cuyahoga Cnty. Juv. Ct.*, 554 F.3d 624, 643 (6th Cir. 2009) (recognizing an abuse of discretion "where a district court fails to . . . consider the competing arguments of the parties" (citation modified)). We likewise decline to resolve the parties' competing arguments for the first time on appeal. *See Energy Mich., Inc. v. Mich. Pub. Serv. Comm'n*, 126 F.4th 476, 501 (6th Cir. 2025) ("[W]e are a court of review, not first view"

(citation modified)). Hewing to that traditional practice is all the more warranted here due to the district court's comparative expertise in scrutinizing the underlying fee arrangement. *See In re Sw. Airlines Voucher Litig.*, 898 F.3d 740, 743 (7th Cir. 2018) (acknowledging that district courts are "far better suited than appellate courts to assess" attorney's fee awards in class actions (citation modified)). Indeed, an explanation from the district court on the topic is a prerequisite to "facilitate appellate review of a fee award." *U.S. Structures, Inc. v. J.P. Structures, Inc.*, 130 F.3d 1185, 1193 (6th Cir. 1997). The absence of one here thus "requires us to remand the case for further consideration" of Morgan & Morgan's final argument. *Id.*

## III.

The judgment of the district court is affirmed in part, reversed in part, and remanded for further proceedings consistent with this opinion.

_____

**CONCURRENCE**

_____

THAPAR, Circuit Judge, concurring.  On the evening of February 3, 2023, residents in East Palestine, Ohio, were winding down for the day.  Just before 9:00 p.m., a loud boom reverberated across the town.  A Norfolk Southern train carrying over 1.6 million pounds of hazardous chemicals had derailed.  The derailment kicked off a series of fires that lasted for several days and ultimately required a controlled explosion that exposed over half a million residents in East Palestine and nearby towns to toxic fumes and environmental hazards.  The derailment also kicked off a series of lawsuits that resulted in Norfolk Southern agreeing to pay $600 million to compensate residents for their medical bills, relocation expenses, and business losses.

That settlement was approved in September 2024.  Over a year later, many of these residents haven't yet seen a penny.  Take Tracy Hagar.  She's been trying to escape East Palestine with her husband and two young sons.  But she doesn't have the money to move, and compensation for relocation expenses is on hold until all appeals have been resolved.  Until then, Tracy and her family are forced to remain in their home where they occasionally still smell chemicals from the derailment.  She recounted, "I just can't get away from it."  Jordan Anderson, *For East Palestine Residents, an Uneven Road to Recovery 2 Years After Train Derailment*, Pittsburgh Post-Gazette (Feb. 2, 2025, at 5:30 AM).

Or take Anna Doss.  She operated a gas station in the center of East Palestine for 24 years, but she lost half of her business after the derailment.  Her settlement check is also held up by the appeals in this case, so she had to sell the gas station.  In her words, "The financial impact was devastating to me, and I ran out of money."  Gerry Ricciutti, *Payment Wait Tough for People in East Palestine*, WKBN (Dec. 10, 2024, at 12:43 PM).

But while the plaintiffs waited, the lawyers were paid in full.  That's because the settlement award included a quick-pay provision.  This provision guaranteed the lawyers would

get paid $162 million in attorneys' fees and $18 million in expenses within 14 days of the settlement's approval.

Although quick-pay provisions are a common component of class-action settlements, I write separately to express some concerns. These provisions—which allow attorneys to get paid while injured plaintiffs wait—improperly align incentives between counsel and their clients, create an appearance of unfairness that reflects poorly on the legal system, and enable gamesmanship by class counsel. These concerns were compounded here because the district court failed to meaningfully supervise the allocation of attorneys' fees.

That's not to say all quick-pay provisions are bad. Some serve a valid purpose, like the quick repayment of costs. But if a settlement includes a quick-pay provision, district courts must ensure the agreement provides adequate safeguards and must supervise the fee allocation.

I.

Federal Rule of Civil Procedure 23 imposes two interdependent obligations on district courts: review settlement terms about attorneys' fees to ensure they're reasonable and scrutinize all elements of such a fee award. *See* Fed. R. Civ P. 23(e)(2), (h).

First, a district court must ensure that a class-action settlement "is fair, reasonable, and adequate." Fed. R. Civ. P. 23(e)(2). In doing so, a district court must "tak[e] into account" the "terms" and "timing" of any proposed attorneys' fee awards. Fed. R. Civ. P. 23(e)(2)(C)(iii). For example, an attorneys' fee award might make a settlement unfair, unreasonable, and inadequate if it "gives preferential treatment to class counsel" or allows class counsel to "disregard their fiduciary responsibilities" to the class. *In re Dry Max Pampers Litig.*, 724 F.3d 713, 718 (6th Cir. 2013) (quotation omitted). When a district court approves a settlement containing an impermissible fee award, it violates Rule 23, and that usually constitutes a reversible abuse of discretion. *See Gascho v. Glob. Fitness Holdings*, *LLC*, 822 F.3d 269, 279 (6th Cir. 2016).

Second, and relatedly, Rule 23(h) requires district courts to "carefully scrutin[ize]" all elements of a fee award to "make sure that [each] counsel is fairly compensated for the amount

of work done as well as for the results achieved."  *Id.* (quotation omitted); Fed. R. Civ. P. 23 advisory committee's note to 2003 amendment.  This "careful scrutiny" is not just limited to the overall amount of the award.  It also includes the allocation of fees among participating counsel. 4 W. Rubenstein, *Newberg and Rubenstein on Class Actions* § 15:23 (6th ed. 2025) (collecting cases); *Bowling v. Pfizer, Inc.*, 102 F.3d 777, 781 n.3 (6th Cir. 1996) (explaining that district courts should consider fee-allocation agreements when approving a class settlement).  In other words, deciding what constitutes an appropriate attorneys' fee award may entail determining *who* gets those fees.

But this case presents a twist on the district court's typical analysis of a proposed class settlement:  a quick-pay provision.  Typically, quick-pay provisions don't run afoul of Rule 23. In fact, they're so common that they usually are approved and upheld on appeal without comment or controversy.  Rubenstein, *supra*, § 13:8.  As of 2006, over one-third of federal class-action settlements included quick-pay provisions.  *See* Brian T. Fitzpatrick, *The End of Objector Blackmail?*, 62 Vand. L. Rev. 1623, 1643 (2009).  And no circuit has adopted a blanket rule that quick-pay provisions violate Rule 23.

That's for good reason.  Some type of quick-pay provision makes sense in most class-action litigation.  After all, the plaintiffs' attorneys often front substantial costs to fight a class action.  So quick-pay provisions help them quickly recoup those costs.

But *full* payment of fees?  That's problematic for a few reasons.  First, a speedy payday for the attorneys misaligns the incentives between counsel and their clients.  Once the attorneys pocket all their fees, they have no financial reason to bring the litigation to a close, even if their clients still do.  Second, the prompt and full payment for the attorneys while injured plaintiffs desperately wait for their money seems unfair.  And that appearance of unfairness brings the legal profession and the judicial system into disrepute.  Third, rushing to pay the attorneys can encourage lead counsel to collude with other firms to unfairly divide the fee award.

At least one thoughtful professor believed quick-pay provisions deterred "objector blackmail."  *See* Fitzpatrick, *supra*, at 1624–25.  But experience has shown quick-pay provisions may not accomplish that objective.  *See* Rubenstein, *supra*, § 13:8.  What's more, district courts

can reject payouts to frivolous objectors under Rule 23(e)(5)(B).  And if those objectors appeal, courts can impose significant appeal bonds.  *See* Fitzpatrick, *supra*, at 1625.  So the leading treatise has observed, "it seems a tad too convenient that the best solution anyone can devise to address the problem of professional objections happens to be to pay class counsel immediately while the class waits—especially when that solution hasn't appeared to solve the problem." Rubenstein, *supra*, § 13:8.

None of this is to say that quick-pay provisions should be banned.  Instead, if district courts approve such provisions, they should encourage class-action settlements to include safeguards that address the above concerns.  For example, quick-pay provisions should allow the lawyers to recover only their costs—or some predetermined portion of the fee award—while keeping the rest of the award in escrow until the class gets paid.  Additionally, quick-pay provisions should be coupled with claw-back terms that require attorneys to repay any fee award if an objection or other appeal is successful.

Likewise, district courts should require that class-action settlements with quick-pay provisions give the district court jurisdiction to resolve disputes amongst counsel about the allocation of fees.  Such a guarantee of ongoing judicial supervision reduces the risk that counsel will engage in self-dealing.  District courts can further diminish that risk by placing third parties like escrow agents in control of distributing funds rather than handing over the reins to lead counsel.

What's more, district courts should pay close attention to the timing of the attorneys' payout.  One of the primary risks of a quick-pay provision is that it shortens the clock for attorneys to object to their allocations after the fee award is approved.  So district courts should budget time to fully resolve objections well in advance of the quick-pay provision's effective date.  *See* Rubenstein, *supra*, § 15:23.  And the less time between approval and payout, the more scrutiny should occur at the approval phase.  That's because attorneys won't have as fulsome of an opportunity to object afterwards.

Above all, district courts must remain mindful that they are the only independent actor with an incentive to get the fee allocation right.  Lead counsel, of course, is inherently self-

interested when allocating the money between firms. So district courts must be careful to *never* allow lead counsel's proposed awards to become final without subjecting them to impartial scrutiny. *In re High Sulfur Content Gasoline Prods. Liab. Litig.*, 517 F.3d 220, 234–35 (5th Cir. 2008). As Judge Ambro colorfully put it, "How much deference is due the fox who recommends how to divvy up the chickens?" *In re Diet Drugs Prods. Liab. Litig.*, 401 F.3d 143, 173 (3d Cir. 2005) (Ambro, J., concurring). Very little. When district courts blindly defer to the lawyers' judgment, they allow the allocation process to become corrupt and unfair.

## II.

While the above discussion summarizes what district courts should do in reviewing quick-pay provisions, this case provides a cautionary tale about what district courts should *not* do.

On the same day the district court approved the settlement, it awarded the 39 firms representing the injured plaintiffs $162 million in attorneys' fees and $18 million in costs. And it granted Class Counsel—the three primary law firms representing the class—sole authority to divide that award between all the law firms.

These approvals triggered a classic quick-pay provision. This term guaranteed that the fee award would be paid into escrow "within fourteen (14) days after the grant of Final Approval," then "wired . . . to an account number identified by Class Counsel." R. 452-2, Pg. ID 6028. Working on that tight schedule, Class Counsel announced that it had "finalized" the fee allocations a mere 10 days after the district court's final approval. R. 664-1, Pg. ID 46335. And like clockwork, it started paying the other firms four days later. This timeline didn't give Morgan & Morgan or anyone else a chance to tell the district court there might be problems with the fee allocations before the money was distributed.

Granted, some factors suggest the quick-pay provision in this settlement was reasonable. First, the fee award was a percentage of the total settlement, so the plaintiffs' payouts remained the same regardless of when counsel got paid. Second, the settlement terms gave the district court jurisdiction over any disputes, including those arising out of the fee award. And third, the fee award included a stringent claw-back provision, which required the attorneys to repay the

award with interest to Norfolk Southern in 14 days if the final settlement was reversed or materially modified on appeal.

But the surrounding context paints a more concerning picture.  The district court knew that its final approval would give Class Counsel 14 days to divide $162 million in fees between 39 firms.  So it should've realized that this tight timeline would prevent the attorneys from negotiating the specific allocation methodology or checking Class Counsel's work.  And it certainly should've anticipated that the timeline would give it no chance to hear objections, much less independently review Class Counsel's methodology.  Put simply, the quick-pay provision made the initial allocations effectively final, and the district court should've recognized that problem.[1]

This rubber-stamping fell far short of the district court's oversight responsibilities.  The district court never confirmed how Class Counsel (1) determined the hourly multipliers, (2) decided which multiplier should apply to each firm, or (3) distinguished between types of work.  Nor did it request to see the auditor's data to confirm the most basic element of the fee allocation—that Class Counsel did the math right.  Even now, appellees insist that Morgan & Morgan billed the fewest hours but received the same multiplier as Class Counsel.  But we can't confirm that's true because we haven't seen the audit data and multiplier rates.  Without this basic information, the district court could not possibly have verified that each firm was reasonably, fairly, and adequately compensated for its work, as required by Rule 23(e) and (h).

In response, the appellees try to sweep the district court's shortcomings under the rug.  They argue that "[b]y retaining jurisdiction over the Settlement and all orders related to it (including the Attorneys' Fee Order), the district court maintained authority over the allocation."  Appellees' Br. at 40.  But jurisdiction isn't the same as supervision—especially when the quick-pay provision shortened counsel's window to object.  Class Counsel announced Morgan & Morgan's award only four days before the quick-pay provision allowed Class Counsel to

---

[1]The quick-pay provision requires $162 million in fees and $18 million in expenses to be paid to the escrow account within 14 days.  But it doesn't provide a clear timeframe for Class Counsel to allocate that fee award to the other attorneys.  So the quick-pay provision may have inadvertently given Class Counsel unfettered discretion over when the other attorneys got paid.  That would've defeated the quick-pay provision's purpose.

disburse the funds. When Morgan & Morgan formally objected, the district court announced it would entertain objections only during a time-limited telephonic conference that was closed to the public and other law firms. And when new issues emerged at that hearing, the district court rejected the parties' offer to submit detailed written briefing about the awards. In short, the district court retained jurisdiction but did nothing to ensure that it properly supervised the fee allocations.

Bottom line, the district court granted sole discretion to Class Counsel to allocate fees within two weeks of the final settlement without seeing its methodology, checking its math, or laying eyes on its proposed awards. So even today, we aren't sure who got what, when, and why. District courts should *never* take such a backseat approach to reviewing attorneys' fee awards.

\* \* \*

District courts must closely supervise attorneys' fee awards to ensure that plaintiffs' lawyers are fairly and reasonably compensated for their contributions to major class-action settlements. This supervision must ensure that plaintiffs like Tracy Hagar and Anna Doss aren't left waiting for their settlement checks, while the lawyers receive their full payday. Victims deserve better.

With these additional observations about what district courts should and shouldn't do to approve attorneys' fee awards, I concur in the majority's thoughtful opinion.